**Jack Charles BLANKENSHIP, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Supreme Court of Tennessee, at Jackson.

July 6, 1993.

---

**4.** No skid marks were left by either vehicle because the pavement was wet.

Timothy W. Smith, Brett Stein, Memphis, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Amy L. Tarkington, Asst. Atty. Gen., Nashville, John W. Campbell, Memphis, for appellee.

## OPINION

DAUGHTREY, Justice.

In this post-conviction appeal, we are asked once again to analyze what constitutes a "voluntary" and "intelligent" guilty plea under *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). It is a question most recently treated by this Court in *State v. Neal*, 810 S.W.2d 131 (Tenn.1991), on which the Court of Criminal Appeals based its decision in this case, and in *State v. Montgomery*, 840 S.W.2d 900 (Tenn.1992). Because the petitioner claims that the opinion in *Neal* is in conflict with dispositive federal law on this question, and because one member of the Court of Criminal Appeals panel that heard this case below agreed in dissent, we granted discretionary review to clarify several points of relevant law.

## I. PROCEDURAL HISTORY

This case was initiated by the filing of a *pro se* post-conviction petition in 1988. In that petition, Jack Charles Blankenship challenged the validity of the life sentence he is serving as a habitual criminal, on the ground that the six predicate convictions used to establish his status as a recidivist were based on invalid guilty pleas.[1] The earliest of these six convictions was obtained in 1970, for third-degree burglary.[2] The next four convictions—all of them burglary-related—resulted from guilty pleas entered in June 1972. The sixth and last predicate conviction was obtained in March 1975, when Blankenship pleaded guilty to voluntary manslaughter.

The trial court appointed counsel to represent Blankenship, and the attorney filed an amended petition on his client's behalf, specifying as grounds for relief: (1) that before pleading guilty in the prior cases, Blankenship was not "fully and adequately informed of his right not to be compelled to incriminate himself" and (2) that he "was not informed that the convictions resulting from said guilty pleas could be used in any manner to enhance punishment for any offenses for which he might be found guilty in the future."

When Blankenship's initial attorney was replaced by two other appointed lawyers in 1989, they filed a "second amended petition," incorporating the grounds set out in the earlier amended petition and adding a new ground for relief: that the guilty plea Blankenship entered in 1977 to a charge of first degree murder was invalid for the

---

1. In July 1977, Blankenship pleaded guilty to armed robbery and being a habitual criminal; he was sentenced to imprisonment as a recidivist. Because the predicate convictions used to establish recidivism had not been challenged directly or collaterally prior to his 1977 guilty plea and were not challenged at the submission hearing, one might expect the state to argue that the 1977 guilty plea to the habitual criminal count, if valid, constituted a waiver of any error with regard to the predicate convictions. This argument has not been advanced, however, and we have chosen not to raise it *sua sponte* as a procedural bar to our discussion on the merits.

2. Virtually no evidence concerning this conviction appears in the record. Blankenship testified that he had no independent recollection of the guilty plea hearing, and a transcript was not produced, perhaps because of a typographical error in the date of the hearing contained in the trial court's Order to Prepare Transcript of Guilty Plea Proceedings. The trial court held that the petitioner had not carried his burden of proof as to this allegation, and the 1970 conviction is not at issue on appeal.

same reasons as the 1972 and 1975 convictions.[3]

At the post-conviction hearing in the trial court, testimony established that Blankenship's 1977 guilty pleas were entered as a "package deal"—two concurrent life sentences, one as a habitual criminal for the offense of armed robbery and the other for first degree murder—in order to avoid trial and a possible death sentence in the murder case. The transcript of the guilty plea proceeding fails to exhibit any substantial deficiencies with regard to the submission and acceptance of the plea to first degree murder, and no complaint about this plea has been raised on appeal.

With regard to the petitioner's 1975 conviction of voluntary manslaughter, it appears that his guilty plea was induced by the prosecutor's offer to reduce the original charge, which was for second-degree murder. At the guilty plea hearing, the trial judge engaged in a lengthy colloquy with Blankenship, making sure that he understood the charge to which he was pleading guilty and the ramifications of his plea. The judge also informed Blankenship of the rights he would be waiving by pleading guilty, including the right to trial, at which a jury would "hear[ ] the witnesses, pro and con, both for you and against you"; the right to testify or not, with instructions to the jury that "they couldn't hold [the decision not to testify] against you; and the right to appeal the verdict "in the event the jury did find against you." However, the trial judge did not warn him that this conviction could be used to enhance a future sentence in a subsequent prosecution.

The 1972 submission hearing was much less extensive. Blankenship pleaded guilty to a total of five charges (four of which are at issue here), apparently in return for the prosecutor's recommendation that he receive concurrent sentences of not more than five years. The factual basis for each of the five cases was recited by the prose-

cutor, and Blankenship waived his right to trial and to appeal in each instance. The waiver form he signed and submitted to the court indicates that he had been informed of all the rights attendant to a jury trial, but the only one specifically mentioned on the form was the right to confrontation. The record does not show that he was informed at the 1972 hearing that he could not be compelled to incriminate himself, nor was he told that the convictions entered against him could be used to enhance future sentencing.

It was the second of these two deficiencies about which Blankenship specifically complained during his testimony at the post-conviction hearing. Over and over again, he emphasized that he wanted the benefit of the bargains he had struck with the state in 1972 and 1975. A typical exchange follows:

Q: [by prosecutor]: [Y]ou wanted to get that guilty plea.

A: [by petitioner]: Yes, sir.

Q: And, whatever the Judge told you, you wanted to get the guilty plea, is that right? You wanted to go—

A: Well, yes, sir, when you plead guilty, that means, you know, you are pleading guilty for a lesser offense. You want to—

Q: You want to take that. And, the Judge asked you all these questions and you are saying that whether you understood him or not you—

A: What I didn't realize and understand though that they could take those cases and use them to give me the Habitual Criminal they got me—

Q: Okay. But, was that the biggest complaint that you have, that you didn't know when you pled guilty to those cases that—

A: Well, I didn't know the rules or know anything about the law or my rights.

---

**3.** When Blankenship pleaded guilty in 1977, there were two indictments pending. One was for armed robbery and included, as a second count, the habitual criminal charge under attack here. The second indictment was factually unrelated to the first. It charged Blankenship with the capital offense of first-degree murder,

as the "triggerman" in a murder-for-hire factually unrelated to the first. It charged Blankenship with the capital offense of first-degree murder, the as "triggerman" in a murder-for-hire that ultimately resulted in his co-defendant, Richard Austin, receiving the death penalty. *See State v. Austin,* 618 S.W.2d 738 (Tenn.1981).

Q: But, now, what is it that you are complaining on, whether, about the fact that he wasn't, that wasn't explained to you or the business about testifying, what was your biggest complaint?

A: Well, I'm complaining that no one ever explained to me, that when I pled guilty to that case, I thought when you pled guilty that's like telling society that you know right from wrong and you're pleading guilty for a lesser offense because you are owning up to what you done.

Q: Okay.

A: I didn't know they would take that, for what I pled guilty to, and take it and use it on me fifteen or twenty years later, to say, yeah, we are going to put you away for life. I didn't understand that then.

Q: That, and that—

A: Because I thought it was over with. I thought because I pled guilty to society that I was taking my punishment and that would be it.

Q: Okay. And, is this, the way I understand it, that is your biggest complaint, is that correct?

A: Yes, sir.

At another point, Blankenship was asked, "You entered those guilty pleas [in 1972] because you wanted to get that case over with, right?" To this question, Blankenship replied, "Yes, sir." The following exchange then occurred:

Q: [Your lawyer] worked you out a five-year concurrent package.

A: Yes, sir.

Q: Okay. When you entered that guilty plea that's what you wanted to do.

A: Yes, sir. It was five years on each one, concurrent.

Q: Okay. And, regardless of what the Judge told you, you were going to take that five year offer, right?

A: Yes, sir.

The petitioner further testified that he was not aware of his right against self-incrimination until 1978 or 1979, when he "started reading some of the law in prison." He told the trial judge that he had completed the 11th grade in high school and agreed that he considered himself to be a person of "average intelligence." When asked by the judge if he knew in 1972 what the expression "taking the Fifth" meant, Blankenship replied, "Yeah, I'd seen that on TV."

Finally, pushed by the prosecutor on cross-examination, the petitioner testified with regard to the 1972 convictions as follows:

A: You want to know the truth? I'm going to speak the truth now. I didn't pay no attention about nothing they was telling me. All I wanted was the plea bargain....

I didn't understand what was going on anyway.

Q: But, you wanted the plea agreement. And you didn't care what the Judge was telling you. You wanted the plea agreement. Is that right?

A: Yes, sir. I wanted to plead guilty.

In his order denying post-conviction relief, the hearing judge made extensive findings of fact, including a finding that "[t]he petitioner was emphatic in his testimony that his chief complaint or 'gripe' is the fact that the pleas entered in 1970, 1972, and 1975 [were] used to elevate him to the status of a habitual criminal," without notice to him at the time he entered those guilty pleas. The record fully supports this finding. It also supports the court's conclusion that "the petitioner would have accepted and entered all prior guilty pleas even though the trial court did not specifically advise him of his 5th amendment right" and that there was no legal basis to support his "conten[tion] that the pleas were not knowingly, voluntarily and intelligently entered."

After the hearing court entered judgment against the petitioner, but before the Court of Criminal Appeals released its opinion affirming that judgment, we decided the case of *State v. Neal*, 810 S.W.2d 131 (Tenn.1991). In determining that the omission of advice concerning Blankenship's right against self-incrimination at the 1972 guilty plea proceeding was technically a violation of *Boykin*, the Court of Criminal

Appeals relied on what it referred to as the "but for provision" of *Neal:*

> In a case where the erroneous omission [of a *Boykin* waiver] is the basis for relief under a post-conviction petition, the defendant-petitioner must allege and prove the omission, and that but for the omission the guilty plea would not have been entered.

*Neal* 810 S.W.2d at 139. On the basis, first, that the petitioner had failed to establish that "but for" the disputed omissions, he would have pleaded not guilty and gone to trial, and, second, that the omissions constituted harmless error, the Court of Criminal Appeals affirmed the hearing court's judgment in a split opinion.

The dissenting judge concluded that the record reflected "gross violations" of *Boykin* in connection with the 1972 guilty plea proceeding. He agreed that the pleas were "voluntary," given the petitioner's expressed desire to plead guilty regardless of the court's failure to protect his rights. But, he concluded that they could not be considered "intelligent," because of the court's failure to advise the petitioner of certain rights. The dissenting judge further concluded that the omissions at the 1972 hearings could not be excused under *Neal*'s "but for" language, because that analysis conflicts with prevailing federal law on the burden of proof in a post-convic-

tion challenge to the validity of prior guilty pleas.

## II. *BOYKIN* AND *NEAL*

■ The petitioner now contends, echoing the dissenting opinion in the intermediate court, that the "but for" ruling in *Neal* cannot be invoked to deny relief in this case, and we agree. Soon after the release of *Neal*, we acknowledged in reviewing another alleged *Boykin* error that "[t]he 'but for' expression in [*Neal*] should not be read to impose an additional burden upon the petitioner." *Johnson v. State*, 834 S.W.2d 922, 926 (Tenn.1992). Indeed, it appears from the reliance in *Neal* on the United States Supreme Court opinions in *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), that the "but for" rule is properly applied only in those cases in which the alleged invalidity of a prior guilty plea is attributable to ineffective assistance of counsel. To the extent that the language of *Neal* appears to hold otherwise, it cannot be considered good law.[4] But, the principal thrust of our ruling in *Neal*, concerning the burden of proof in a post-conviction action challenging the validity of a guilty plea and the effect of substantial compliance and harmless error on the validity of such a plea, is consistent with relevant federal law and is thus applicable to this case.[5]

---

**4.** Hence, we need not address the question posed by the dissenting judge in the Court of Criminal Appeals concerning the constitutionality of the retrospective application of *Neal* to the pleas in this case.

**5.** A recent decision of the United States Supreme Court, in which the Court emphasized the need for finality and the presumption of regularity arising from a criminal conviction, may have a substantial impact on post-conviction cases in state courts, as well as on habeas corpus actions filed by state prisoners in federal court. In *Parke v. Raley*, —— U.S. ——, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992), *reh'g denied*, —— U.S. ——, 113 S.Ct. 1068, 122 L.Ed.2d 372 (1993), the Court noted that Edward Boykin's due process challenge to the constitutionality of his guilty pleas was made on direct appeal, while Ricky Raley's challenge was, to use the court's term, "collateral"—made in a subsequent proceeding as a defense to an enhancement effort by the prosecution, intended to prove that

Raley was a repeat offender. In Jack Blankenship's case, the challenge comes in a proceeding even farther removed from the original conviction—unlike Raley, Blankenship made no objection to the use of prior convictions at the time they were offered to establish his status as a habitual criminal. Instead, he attacks the validity of his prior convictions in a proceeding collateral even to the recidivist proceeding.

Regarding the merits, the Court in *Parke v. Raley* held that the opinion in *Boykin* "does not prohibit a state court from presuming, at least initially, that a final judgment of conviction offered for purposes of sentence enhancement was validly obtained." *Id.* —— U.S. at ——, 113 S.Ct. at 524. The Court therefore reversed the ruling of the Court of Appeals, which had held that the unavailability of a transcript of the prior guilty plea proceeding constituted a "silent record" under *Boykin*, requiring that the state prove the validity of the petitioner's prior conviction by "clear and convincing extra-record

The guilty pleas at issue here are subject to scrutiny solely under the standards of *Boykin*, because of their timing. All of them were entered prior to this Court's opinion in *State v. Mackey*, 553 S.W.2d 337 (Tenn.1977), in which we imposed additional safeguards in the taking of a guilty plea, beyond the scope of *Boykin*. We did so as a matter of state law, in order better to assure that such pleas are entered voluntarily and intelligently. *Id.* at 340–41. The pleas in this case also predate the promulgation in 1978 of the Tennessee Rules of Criminal Procedure, Rule 11 of which sets up the approved procedure for accepting guilty pleas in the trial courts of this state. And, the pleas at issue in this case were entered before our opinions in *State v. McClintock*, 732 S.W.2d 268 (Tenn.1987); *State v. Gilam*, 732 S.W.2d 600 (Tenn. 1987); *Rounsaville v. Evatt*, 733 S.W.2d 506 (Tenn.1987); *State v. Newsome*, 778 S.W.2d 34 (Tenn.1989); and *State v. Prince*, 781 S.W.2d 846 (Tenn.1989). In all these cases, we have tried to shed light on the requirements for the entry of a valid guilty plea, and to explicate the nature and extent of relief available to a petitioner who alleges and proves that the process to which he was subjected falls short of the constitutional mark. The proliferation of reported cases up to and including *Neal* and *Montgomery* suggests, however, that our past efforts may not have been completely successful. In any event, this case presents a *Boykin* issue and that issue alone. We thus focus again on what is required to satisfy the principles set out in *Boykin*.

The contours of that case should, by now, be clear enough. In *Boykin*, the United States Supreme Court noted that "[a] plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." 395 U.S. at 242, 89 S.Ct. at 1711. In discussing the prerequisites of a valid guilty plea, the *Boykin*

court quoted at length from its prior opinion in *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969), as follows:

> A defendant who enters such a plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. For this waiver to be valid under the Due Process Clause, it must be 'an intentional relinquishment or abandonment of a known right of privilege.' *Johnson v. Zerbst*, 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461] (1938). . . . Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void. Moreover, because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts.

Endorsing this formulation, the *Boykin* court held that the waiver of such fundamental constitutional rights cannot be presumed from a silent record, and that reversible error occurs when "the record does not disclose that the defendant voluntarily and understandingly entered his pleas of guilty." *Boykin*, 395 U.S. at 244, 89 S.Ct. at 1713.

The first principle that must guide an understanding of *Boykin* is perhaps self-evident: in determining whether a guilty plea is voluntary and intelligent for purposes of the federal constitution, "the governing standard . . . is a question of federal law." *Marshall v. Lonberger*, 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983) (citing *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), and *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274). Although the Tennessee cases have tended to focus rather narrowly

---

evidence." The *Raley* court said: "On collateral review, we think it defies logic to presume from the mere unavailability of a transcript (assuming no allegation that the unavailability is due to governmental misconduct) that the defendant was not advised of his rights." *Parke v. Raley,* —— U.S. at ——, 113 S.Ct. at 524.

on whether an accused was advised explicitly of his right to trial by jury, his right against self-incrimination, and his right to confrontation, it is clear under federal law "that *Boykin* does not require separate enumeration of each right waived and separate waivers as to each [of the three rights]." *Fontaine v. United States*, 526 F.2d 514, 516 (6th Cir.1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1476, 47 L.Ed.2d 743 (1976). Instead, the core requirement of *Boykin* is "that no guilty plea be accepted without an affirmative showing that it was intelligent and voluntary," *Fontaine*, 526 F.2d at 516, which showing becomes a matter of constitutional concern precisely *because* the waiver of fundamental constitutional rights is implicated when an accused enters a plea of guilty.

In *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970), the United States Supreme Court established the following rule for determining the voluntariness of a guilty plea:

> [A] plea of guilty by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

Or, as the *Boykin* court put it, a plea is not "voluntary" if it is the product of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats...." *Boykin*, 395 U.S. at 242–3, 89 S.Ct. at 1712.

In order to find that the plea was entered "intelligently" or "knowingly", *Boykin* requires that the trial court "canvass[ ] the matter with the accused to make sure he has a full understanding of *what the plea connotes* and of *its consequences.*" *Id.* 395 U.S. at 244, 89 S.Ct. at 1712 (emphasis added). As the United States Supreme Court noted in *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct.

160, 164, 27 L.Ed.2d 162 (1970), decided the year after *Boykin*, "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."

The federal courts recognize that "the decision to plead guilty is often heavily influenced by the defendant's appraisal of the prosecution's case against him and the likelihood of securing leniency through a plea bargain." *Brown v. Perini*, 718 F.2d 784, 786 (6th Cir.1983), *quoted in Caudill v. Jago*, 747 F.2d 1046, 1052 (6th Cir.1984). It was undoubtedly this sort of "influence" that was at work in the 1972 plea proceeding now under review. But, the mere existence of such an inducement to plead guilty does not constitute grounds for invalidating Blankenship's 1972 pleas. Instead, a court charged with determining whether those pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial. *Caudill v. Jago*, 747 F.2d at 1052.

Federal law recognizes the "well-established [principle] that a plea of guilty cannot be voluntary in the sense that it constitutes an intelligent admission that the accused committed the offense unless the accused has received 'real notice of the true nature of the charges against him, the first and most universally recognized requirement of due process'." *Marshall v. Lonberger*, 459 U.S. at 436, 103 S.Ct. at 852 (citation omitted). Hence, there must be a full explanation of the offense to which the defendant is pleading and "nothing to indicate that he was incompetent or otherwise not in control of his mental facilities" at the time the plea is entered. *Brown v.*

*Perini,* 718 F.2d at 788 (citing *Brady v. United States,* 397 U.S. at 756, 90 S.Ct. at 1473).

Finally, in addition to an understanding of the charges, the defendant must be aware of the "direct consequences of his guilty plea." *Brown v. Perini,* 718 F.2d at 788; *see also Brady v. United States,* 397 U.S. at 755, 90 S.Ct. at 1472 (accused must be "fully aware of the direct consequences" of his guilty plea). The most obvious "direct consequence" of a conviction is the penalty to be imposed. It is, therefore, well-recognized that the defendant must be apprised of the sentence that he will be forced to serve as the result of his guilty plea and conviction.

 By contrast, some consequences are considered "collateral," rather than "direct." For example, the federal courts are split on the question of whether parole eligibility constitutes a "direct consequence" of a guilty plea. *See Brown v. Perini,* 718 F.2d at 788–89 n. 4; *but see Sparks v. Sowders,* 852 F.2d 882, 885 (6th Cir.1988) ("gross misadvice concerning parole eligibility can amount to ineffective assistance of counsel"). However, there is no federal authority for the proposition that the subsequent use of the conviction to enhance a future sentence is a "direct consequence" of the guilty plea that forms the basis for that conviction. Hence, the failure of the trial court to inform Blankenship that the guilty pleas he entered in 1972 might later be used to establish his status as a repeat-offender does not affect the constitutional validity of those pleas under *Boykin.*[6]

### III. CONCLUSION

 From the foregoing discussion, it appears that the only question that remains for determination stems from the 1972 submission hearing, at which the trial court failed to advise Blankenship explicitly, before accepting his guilty pleas, that he had a right not to incriminate himself—a right that he would necessarily waive by persisting in his intent to plead guilty. In all other respects, the pleas the petitioner entered at the 1972 proceeding appear to have been both "voluntary" and "knowing."

We conclude that the omission in question, when viewed in context, is not sufficient to invalidate the convictions based on pleas that were otherwise valid in all respects. We reach this conclusion based on two observations. First, it is clear from federal law, as well as from our opinion in *Neal,*[7] that the failure to enumerate precisely the three *"Boykin* rights" will not automatically entitle a petitioner to relief from the effects of a prior guilty plea. By the same token, proof that petitioner waived these three rights, important as they are, will not be sufficient—without more—to establish that the resulting guilty pleas were voluntarily and intelligently entered.

The proof in this record unquestionably establishes that the petitioner's 1972 and 1975 guilty pleas were constitutionally valid for purposes of federal law. As to the 1975 submission hearing, it appears that the requirements of *Boykin* were satisfactorily met. As to the 1972 hearing, we find that the omission of advice concerning the petitioner's right against compelled testimony was, at most, harmless error. It follows that the resulting convictions were not subject to challenge under *Boykin.* The denial of relief by both the trial court

---

6. In contrast to federal law, state law requires that a defendant who pleads guilty be informed that the resulting conviction may later be used as the basis for enhancement. *See State v. McClintock,* 732 S.W.2d 268, 273 (Tenn.1987). That rule was announced 15 years after the pleas in this case were entered and is not relevant to the question of federal law presented here.

7. In *Neal,* we declined to "depart from the full litany of information that is required [by *Boykin* ] to be communicated" to a defendant who pleads guilty. 810 S.W.2d at 134. But, we also indicated that "absolutely literal compliance with the advice to be given is not required," as long as "the sense of the substance of the required advice ... is [expressed to an accused prior to his guilty plea]." *Id.* at 137. The result is "substantial compliance" with the *Boykin* mandate.

and the Court of Criminal Appeals is therefore affirmed.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.